IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Salvador Estrada, ) | C/A No.: 0:11-2387-MBS-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Founders Federal Credit Union, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff Salvador Estrada ("Plaintiff") filed this employment action against Founders Federal Credit Union ("Defendant") on August 12, 2011 in the Court of Common Pleas in Lancaster County, South Carolina, asserting claims of race and national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). [Entry #1-1]. Defendant removed the case to federal court on September 7, 2011. [Entry #1]. This matter comes before the court on Defendant's motion for summary judgment filed April 19, 2012. [Entry #22]. Plaintiff filed a response on June 6, 2012 [Entry #26], and Defendant filed a reply on June 25, 2012 [Entry #29].

All pretrial proceedings in this case were referred to the undersigned on January 1, 2012, pursuant to the provisions 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the

reasons that follow, the undersigned recommends that Defendant's motion for summary judgment be granted.

I.     Factual Background

Pursuant to Fed. R. Civ. P. 56, the court views all facts and inferences in the light most favorable to the Plaintiff. In 2002, Defendant hired Plaintiff, a Mexican-born immigrant and leader in the Hispanic community, in an effort to market financial products to the Hispanic population. Defendant created the position of Marketing Strategist for Plaintiff because Defendant wanted someone who Hispanics could communicate with, trust, and who understood the culture. [Entry #22-2 at 24].

During his first year of employment, Plaintiff conducted cultural diversity training and worked with many different Hispanic organizations and task forces. [Entry #22-3 at 18]. At his 2003 performance evaluation, he received an average rating of 4/5 and was tasked with developing a strategic plan to improve Defendant's performance in serving and marketing to Spanish-speaking individuals. *Id*. at 17–18. Effective September 2003, Plaintiff's job title changed from Marketing Strategist to Multi Cultural Coordinator so his title would more accurately reflect what he was doing on a daily basis. [Entry #22-2 at 39–40]. Plaintiff rated 4.1/5 in his June 2004 performance review, and he was advised to increase his knowledge of Defendant's policies and procedures. [Entry #22-3 at 22–23].

On November 8, 2004, Plaintiff accepted the Loan Officer 1 position at Defendant's new Lancaster Square branch, a bilingual branch. *Id*. at 24. Although this was a lateral transfer and did not result in a pay increase, Plaintiff saw it as a promotion and an exciting opportunity. [Entry #22-2 at 46–47]. In this new position, Plaintiff

2

reported to Geri Rucker. *Id*. at 48. At the conclusion of his first six months as a Loan Officer, Plaintiff received an average 3.7/5 performance evaluation and was encouraged to seek assistance with loan policies and procedures as needed and cross-train with the goal of being promoted to Assistant Vice President ("AVP"). [Entry #22-3 at 27–28].

In 2006, Sharon Teague replaced Rucker as Plaintiff's supervisor upon Rucker's promotion to Regional Vice President. [Entry #22-2 at 52–53]. Teague reported to Rucker, who reported to Mike Bragg (white), the Chief Operations Officer over the branches, lending, and recovery. *Id*.; Entry #22-8 at 2. Teague indicated a May 2006 evaluation that Plaintiff had a good understanding of loan policy and procedure, and encouraged Plaintiff to continue to familiarize himself with all branch policies and procedures to prepare for future leadership positions with Defendant. [Entry #22-3 at 33–35]. The goal was for Plaintiff to be promoted to AVP within three to six months. *Id*. at 36.

On June 19, 2006, Plaintiff was counseled for having six checks returned for insufficient funds ("NSFs") within the preceding 12 months. *Id*. at 37. Defendant requires its employees to act as examples to its members and takes NSFs very seriously. [Entry #22-2 at 56–58]. Plaintiff indicated that he understood the importance of keeping his checking account in good standing, but on July 18, 2006, he had another NSF. *Id*. Plaintiff was counseled again and advised that any further mismanagement of his account could result in termination of his employment. [Entry #22-3 at 38].

Between July 2006 and January 2007, Plaintiff received no further disciplinary action. Although Plaintiff's promotion was delayed due to his discipline about his NSFs,

3

Teague, Rucker, and Bragg recommended he be promoted to AVP in January 2007 and the recommendation was accepted effective January 1, 2007. [Entry #22-4 at 4; Entry #22-7 at 22–24].[1]

On June 4, 2007, Plaintiff was again counseled about NSFs. [Entry #22-4 at 5]. Plaintiff was advised that if he had another NSF during the next 90 days, he would be terminated. *Id*. During 2008, Plaintiff's loan portfolio continued to grow, but for the first time, there were collection issues. On August 25, 2008, Plaintiff was counseled about his past due ratio, which was the highest of all Defendant's lenders. *Id*. at 17. Going forward, Defendant directed Plaintiff to focus on the quality of the loans he was making. *Id*. By the time of his January 2009 evaluation, his past due ratio had improved, but Plaintiff was still encouraged to focus his attention on his past dues. *Id*. at 18–21.

In February 2009, the AVP for Defendant's Arrowood Road branch in Charlotte resigned her employment, creating a vacant position. [Entry #22-8 at 18]. Bragg met with the Vice President in charge of the branch, as well as the Regional Vice President over the branch, and it was decided that Plaintiff would be offered the position. *Id*. The branch was second in terms of utilization by Spanish-speaking members. *Id*. Bragg knew that the Lancaster Square branch, which had operated at a loss of $600,000 per year, was not going to remain a full service center. *Id*. at 17–18. Thereafter, Rucker and Teague met with Plaintiff to ask whether he would consider transferring to the Arrowood Road branch. [Entry #22-2 at 80]. Plaintiff agreed, and on February 17, 2009, he transferred

---

[1] Although Defendant construed Plaintiff's complaint as setting forth a claim for failure to promote Plaintiff speedily enough, Plaintiff's brief explicitly states that he is not pursuing such a claim. [Entry #26 at 20].

4

from Lancaster Square to the Arrowood Road branch. *Id*. at 80, 83. At Arrowood Road, Plaintiff reported to Daryl Bowie. *Id*. at 83. Bowie, in turn, reported to John Stone, who reported to Mike Bragg. The transfer ultimately resulted in Plaintiff having greater responsibilities because Bowie spent most of his time at the other two branches, leaving Plaintiff in charge of the Arrowood branch. *Id*. at 84.

On May 27, 2009, Plaintiff attended a manager's meeting conducted by Bragg. Bragg instructed all the managers of the need to verify Hispanic members' proof of income and social security number or taxpayer identification. [Entry #26-1 at 8]. According to Plaintiff, Bragg commented that "perhaps [Defendant] moved too fast into the Hispanic market." *Id.*

Immediately following the meeting, Stone, Bowie, and Bragg met with Plaintiff. *Id*. at 187. Plaintiff was counseled about his general lending practices and particularly a loan he made to a member so that the member could invest in a gas station in Honduras. [Entry #22-2 at 187–88]. Defendant, and specifically Bragg, who was in charge of all lenders, believed this transaction was not a sound business decision, and it prompted him to request an audit of Plaintiff's loan portfolio. [Entry #22-8 at 4–6]. The audit revealed loans to members outside of Defendant's market area, such as new members in Texas, and for purposes such as buying land in Honduras, Mexico, Ecuador, to invest in Mexico, to build in Mexico, and for immigration fees. [Entry #22-2 at 88–90]. According to Plaintiff, Bragg told him that Honduras was on the terrorist watch list and the loan was

5

therefore problematic.[2] [Entry #26-1 at 9]. Bragg spoke with Plaintiff about his lending practices and specifically about not making loans outside of Defendant's market. [Entry #22-4 at 22]. They also discussed the need to comply with federal laws and, in particular, meeting the requirements of adequate identification including a social security or taxpayer identification number. *Id*. Plaintiff agreed to no longer make loans for such things as business investments in Mexico and to make sure that he had appropriate information prior to opening an account or closing a loan. *Id*. At some point following the meeting, Bowie wrote up an Employee Conference Record reflecting the contents of the meeting. [Entry #22-6 at 4]. According to Plaintiff, he chose not to make any comments based on advice from Bowie, but he did sign the document. [Entry #22-2 at 8]. Plaintiff alleges Bragg promised him the document would not be placed in his personnel file or used against him in any way. [Entry #26-1 at 10]. After being counseled, Plaintiff did not make any loans outside of Defendant's market.

On August 21, 2009, Plaintiff was again counseled about NSFs. [Entry #22-4 at 23]. Again, he was advised that further occurrences could lead to termination. *Id*. Also in August of 2009, Stone questioned Plaintiff about expenses he had charged on the corporate credit card. Plaintiff was frequently asked to lecture across the country about marketing to the Hispanic community. Although his expenses were reimbursed by the sponsors of the lectures, he had previously been allowed to use the corporate credit card for expenses before he invoiced the sponsor. Plaintiff was not disciplined as a result of the incident, but he turned in his corporate credit card to avoid further issues. [Entry #29-

---

[2] Plaintiff later learned that Honduras is not on the terrorist watch list.

6

1 at 49–50]. Plaintiff alleges he told Bowie that his integrity had been questioned several times since he moved to the Arrowood branch and that it "seemed like race discrimination," to which Bowie agreed that it looked that way. [Entry #26-1 at 11].[3]

Plaintiff rated 3.2/5 at his January 2010 performance appraisal and received a maximum 2% raise. [Entry #22-4 at 25]. Plaintiff alleges Bowie informed him that Bragg required Bowie to include references to his counseling for loaning outside of Defendant's market and for failing to maintain his personal checking account. [Entry #26-1 at 12].

On June 17, 2010, one of Defendant's members, Gabriel L. Gonzales Vargas contacted Teague, Plaintiff's former supervisor from the Lancaster Square branch. Vargas alleged he and Plaintiff had entered into a business venture called Estrada Extreme Sports, LLC ("Estrada Extreme Sports"), whose members included Vargas, Plaintiff, and Plaintiff's wife. Vargas made an initial investment of $8,000 in Estrada Extreme Sports. [Entry #22-2 at 12]. Vargas told Teague that he had taken out loans from Defendant for Plaintiff, but Plaintiff was refusing to repay him. Vargas brought bank statements that showed (1) a $4000 transfer from Vargas's account to Plaintiff's account on January 13, 2009; and (2) a loan to Vargas of $3500 by Defendant on October 14, 2009. [Entry #22-11 at 5–6].

Upon investigating, Teague discovered that in October 2009, Plaintiff had approved Vargas for a $3500 loan for a "medical emergency." *Id*. at 2; Entry #22-2 at 95. Teague contacted Geri Rucker, the Regional Vice President, who contacted Bragg. Bragg

---

[3] Defendant argues that this statement is inadmissible hearsay. The undersigned has included it here in the interest of presenting a complete record of the arguments.

7

contacted Phyllis Bunkley, Senior Vice President of Human Resources and Training. Bragg tasked Rucker and the audit department with obtaining information about the transactions in question. [Entry #22-9 at 2]. He also requested that Teague get back in touch with Vargas. *Id*.

The next day Teague followed up with Vargas and, at her request, Vargas brought her a copy of a letter his attorney prepared and sent to Plaintiff. [Entry #22-11 at 2–3]. Teague gave Bragg a copy of the letter. *Id*. Bragg also reviewed information about Estrada Extreme Sports found on the South Carolina Secretary of State's website and the information in Defendant's records regarding the transactions in question. [Entry #22-9 at 2]. Bragg instructed Bowie to have Plaintiff report to Defendant's headquarters to meet with Bragg and Bunkley. *Id*. at 2–3.

On Friday, June 18, 2010, Bragg and Bunkley met with Plaintiff. [Entry #22-2 at 103]. Bragg asked Plaintiff whether he knew Vargas, and Plaintiff admitted that he did. *Id*. at 104. Plaintiff admitted he had approved a loan for Vargas, but denied that Vargas had given Plaintiff the proceeds. *Id*. at 105–106. He admitted that Vargas was a business partner in Estrada Extreme Sports. *Id*. Bragg told Plaintiff that he was not supposed to make loans to business partners. *Id*. Plaintiff responded that he had documentation that the business was not operating any more, he had a new partner, and he had reported Vargas to the police for threats against him. *Id*. at 106–107. Bragg told Plaintiff that he violated Defendant's loan policy by making the loan to Vargas in October 2009 without supervisor approval because Plaintiff had a "close professional relationship" with Vargas. *Id*. Defendant's loan policy states, in pertinent part:

8

> Under no circumstances may a loan officer originate or approve a loan or otherwise be involved in the loan process for any related interests or persons of other close professional relationships. These loan requests should be referred to another loan officer for processing and approval.

[Entry #22-9 at 7]. Plaintiff said he understood it could appear to be a conflict of interest, but Estrada Extreme Sports had ceased operations at the time of the loan. [Entry #22-2 at 107]. The meeting ended with Bragg telling Plaintiff they would meet again at 9:00 a.m. on Monday morning. *Id*. at 107–08.

Over that weekend, Plaintiff called CEO Brumfield, who was also Plaintiff's neighbor, and set up a meeting with him for Sunday afternoon. *Id*. at 109. Brumfield was unaware of the situation until Plaintiff contacted him. [Entry #22-7 at 10]. Plaintiff had documents with him that he claimed showed that he was no longer in business with Vargas at the time of the loan. *Id*. at 11. Brumfield advised Plaintiff to bring the documents to the meeting with Bragg the next day. *Id*.

At 8:30 a.m. on Monday morning, June 22, 2010, Bragg and Bunkley met with Brumfield. [Entry #22-7 at 12]. Bragg told Brumfield that he had decided to terminate Plaintiff, and Brumfield concurred. *Id*. at 12–13. Later that morning, Plaintiff met with Bragg and Bunkley. [Entry #22-2 at 110]. Plaintiff told Bragg that he had documents with him that he claimed proved he was no longer in a business relationship with Vargas when the loan was made. *Id*. at 111. Bragg informed Plaintiff that the decision to terminate him had been made. *Id*.

Plaintiff met with Bunkley immediately upon termination to complete an exit interview. *Id*. at 112. In his own handwriting, he indicated that he did not feel he had

9

been treated fairly because of questioning of his personal integrity from upper management. [Entry #22-4 at 28–29]. Nowhere in the document did he suggest that his termination was in any way related to his race or national origin. *Id.*

II.  Discussion

  A.  Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non–movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

  B.  Title VII Framework

To establish a prima facie case of race or national origin discrimination under Title VII, a plaintiff must prove: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Coleman v. Md. Ct. of App.*, 626

F.3d 187, 190 (4th Cir. 2010). The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).

    C.    Analysis

Defendant concedes that Plaintiff has shown that he is a member of a protected class and that he suffered an adverse employment action. The undersigned addresses the remaining elements of Plaintiff's prima facie case.

    1.    Plaintiff's Job Performance

Defendant first argues that Plaintiff has failed to show a prima facie case because he cannot show that he was satisfactorily performing his job. In determining whether Plaintiff was satisfactorily performing his job, the court looks at how Plaintiff was performing prior to the incident at issue in the lawsuit. *See, e.g., Belton v. Chester Lancaster Disabilties and Special Needs Board, Inc.*, No. 0:05-1649-MBS, 2007 WL 528064, *8 (D.S.C. 2007). Here, Defendant argues that Plaintiff's work history was "replete with NSFs and poor lending practices." [Entry #22-1 at 21]. Plaintiff's work history in the two years prior to his termination includes counseling for a high past due ratio in August 2008, but Plaintiff had improved the ratio in time for his January 2009 evaluation. In May 2009, Plaintiff was instructed not to make loans outside of Defendant's market and he was counseled for an NSF in August 2009. However, he rated a 3.2/5 (between "good" and "very good") at his January 2010 performance evaluation, the last evaluation prior to his termination, and received the maximum 2%

raise. [Entry #22-4 at 25]. He also was not disciplined after this evaluation. Therefore, viewing the facts in the light most favorable to Plaintiff, he has shown he was performing his job satisfactorily for purposes of a prima facie case.

        2.        Reasonable Inference of Unlawful Discrimination

Defendant also argues that Plaintiff has not raised a reasonable inference of unlawful discrimination. In response, Plaintiff argues that a series of events began that "placed undue and unfair scrutiny upon Plaintiff at the behest of Bragg." [Entry #26 at 21]. Specifically, Plaintiff cites to: (1) Bragg's questioning of a loan Plaintiff made to a member in Texas; (2) Bragg's statement at a manager's meeting that Defendant may have moved into the Hispanic market too quickly; (3) criticism of Plaintiff regarding a loan he made, the proceeds of which were sent to Honduras; (4) the questioning of Plaintiff regarding a $120 expenditure on the corporate credit card; and (5) Bragg's review of Plaintiff's last performance appraisal and allegedly requiring Bowie to include references to Plaintiff's discipline within the year. *Id.*

None of the incidents cited by Plaintiff raises an inference that Bragg's alleged scrutiny of Plaintiff was based on race or national origin. Two of the incidents involve Defendant's questioning of Plaintiff's lending practices. While this shows Plaintiff's job performance was scrutinized, the record reflects that Plaintiff had previously had a high past due ratio and had made loans Bragg found to be in poor business judgment, which suggests that any extra scrutiny was based on business reasons. Most importantly, there is no evidence that the scrutiny was based on race or national origin. Similarly, Bragg's review of Plaintiff's evaluation only shows further scrutiny of his job performance, but

there is no evidence it was related to his race or national origin. Although Plaintiff may not agree that such scrutiny was warranted, it is the decisionmaker's perception of Plaintiff's job-performance, not the perception of Plaintiff, that is determinative. *King v. Rumsfeld*, 328 F.3d 145, 149, 151 (4th Cir. 2003); *De Jarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citations omitted). Essentially, Plaintiff has alleged that Bragg was not confident in Plaintiff's job performance, but he has raised no inference that the lack of confidence was based on Plaintiff's race or national origin.

Plaintiff also fails to show how Bragg's statement that Defendant may have moved into the Hispanic market too quickly raises an inference that Defendant illegally discriminated against Plaintiff based on his race or national origin. Plaintiff was also offended by Stone's questioning him about his use of the corporate credit card. However, Plaintiff has provided no evidence, besides his own speculation and hearsay testimony, that such questioning was because of his race or national origin.

Plaintiff further claims a reasonable inference of discrimination based on the allegedly more favorable treatment of Tami Settlemeyer, a white female who once held the position of AVP for Defendant. [Entry #26 at 22]. Plaintiff alleges Settlemeyer engaged in misconduct and was demoted to loan officer before she was eventually terminated. Defendant contends that Settlemyer was not a valid comparator because she worked at a different branch and reported to different supervisors. [Entry #29 at 11]. Defendant also argues that Plaintiff was treated better than Settlemeyer because she was demoted after she was counseled for failing to follow operational procedures, while Plaintiff remained in the position of AVP after having been counseled for multiple NSFs

13

and for questionable lending practices. Settlemeyer was eventually terminated for loaning outside of her lending limit, a violation of Defendant's loan policy, just as Plaintiff was terminated for violation of loan policy. [Entry #29-4 at 7].

When a plaintiff bases his discrimination claim on a similarly situated comparator, it is the plaintiff's "task to demonstrate that the comparator is indeed similarly situated." *Haywood v. Locke*, No. 09-1604, 2010 WL 2711294, *2 (4th Cir. July 6, 2010) (citing *Tex. Dep't. of Comty. Affairs v. Burdine*, 450 U.S. 248 (1981)). "Plaintiff [is] required to show that they are similar in all relevant respects to their comparator. Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id*. Here, Settlemeyer and Plaintiff had different direct supervisors, and she did not engage in the same conduct as Plaintiff prior to her termination. Viewing the facts in the light most favorable to Plaintiff, Settlemeyer is neither similarly-situated to Plaintiff, nor was she treated more favorably than he.

### 3. Pretext Analysis

Plaintiff has failed to set forth a prima facie case because he has not raised a reasonable inference of unlawful discrimination. Even if Plaintiff could show a prima facie case, Defendant has set forth a legitimate, non-discriminatory reason for his termination: he violated a policy prohibiting his approval of a loan to persons of close professional relationships. Therefore, the burden shifts back to Plaintiff to show that Defendant's reason for terminating him was pretextual.

In order to show pretext, Plaintiff claims that there is a question of fact as to whether Plaintiff violated the policy and that Bragg "was on a mission to terminate Plaintiff for impermissible reasons." [Entry #26 at 22]. Plaintiff claims that he did not violate Defendant's policy by lending to Vargas because the policy does not specifically include persons with past professional relationships.  However, Plaintiff admits that, although Estrada Extreme Sports had closed its doors before the loan, formal dissolution papers had not been filed based on Plaintiff's accountant's advice to wait because of tax purposes.  Additionally, although Plaintiff claims Vargas' interest in Estrada Extreme Sports had depreciated, there is no indication he presented evidence to Bragg proving the depreciation. Regardless, it is the employer's perception that is determinative and mistakes of fact are not evidence of discrimination. *See King*, 328 F.3d at 149, 151; *Price*, 380 F.3d at 214 n. 1.  The issue of pretext is whether the employer is lying; mistakes of fact are not evidence of unlawful discrimination. *Price*, 380 F.3d 209, 214 n. 1.

Plaintiff also claims that the manner in which he was terminated demonstrates Bragg's personal bias against him. [Entry #26 at 17, 22–23]. Specifically, Plaintiff argues that Bragg acted hastily without consulting Bowie and Stone regarding his decision. However, Plaintiff provides no policy that suggests that his immediate supervisors need to be consulted before a termination.  Additionally, Bragg consulted with Brumfield and Brinkley, who concurred with the decision to terminate Plaintiff.

Regardless, Plaintiff has not provided any evidence that Bragg's alleged personal bias against him was based on his race or national origin.  "Title VII is not a vehicle for

15

substituting the judgment of a court for that of the employer." *Jiminez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir. 1995). Courts do not sit as "super personnel departments second guessing an employer's perceptions of an employee's qualifications." *Malghan v. Evans*, 118 Fed.Appx. 731 (4th Cir. 2004) (citing *Smith v. University of N. Carolina*, 632 F.2d 316, 346 (4th Cir.1980)). In fact, "the law does not require an employer to make, in the first instance, employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory. *Id.,* (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156–57 (2d Cir. 1978)). The court's only concern is:

> whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*DeJarnette v. Corning Inc.*, 133 F.3d 293 (4th Cir. 1998) (citations omitted). Here, Plaintiff has provided no evidence that Defendant terminated him based on his race or national origin instead of Defendant's proffered reason. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (noting it is not enough to disbelieve the defendant—a factfinder must believe plaintiff's explanation of intentional race discrimination). Therefore, the undersigned recommends Defendant be granted summary judgment.

III.    Conclusion

For the foregoing reasons, the undersigned recommends the district judge grant Defendant's motion for summary judgment [Entry #22], and this case be dismissed in its entirety.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

January 8, 2013                                              Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).